IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


HAROLD M. TATE, United States
of America, ex. rel.,

       Plaintiff/Relator,

UNITED STATES OF AMERICA,

       Intervenor,

vs.                                    No. CIV  96-98 MV/LFG

HONEYWELL, INC.,

       Defendant.


## MEMORANDUM OPINION AND ORDER
## ON RELATOR'S MOTION TO COMPEL FURTHER RESPONSES

THIS MATTER is before the Court on the Relator's Motion to Compel Further Responses From Defendant to First Set of Interrogatories and Requests for Production of Documents [Doc. 98]. In accord with the district's motion practice rule, the motion, response and reply were simultaneously filed. Oral argument is not necessary. This matter may be resolved based on the parties' submissions.

### General Considerations

Discovery in federal court proceedings is viewed with liberality. The federal discovery rules are designed in part to "make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." United States v. Procter & Gamble Co., 356 U.S. 677, 682, 78 S. Ct. 983, 986-87 (1958). However, while discovery is viewed with liberality, a party's right to discovery is not unchecked. The Court may properly balance the right of a party to obtain information with an opposing party's right to be free from intrusive, burdensome,

and expensive discovery. Fed. R. Civ. P. 26(b)(2)(iii); <u>Koch v. Koch Indus., Inc.</u>, 203 F.3d 1202, 1238 (10th Cir. 2000); Wright, Miller & Marcus, <u>Federal Practice and Procedure: Civil 2d</u> § 2008.1 (1994 and 2001 pocket part)(discussing proportionality of discovery and proper limitations on discovery).

Escalating costs of litigation, abusive discovery practices and growing backlogs, plus corresponding delays in civil litigation led to the adoption of the Civil Justice Reform Act, 28 U.S.C. § 471 *et seq.* ("CJRA") and to the modification of the Federal Rules of Civil Procedure. In combination, the CJRA and the revised rules of procedure were intended to reduce the costs of litigation and to expedite the ultimate disposition of civil litigation in the federal courts.

In <u>In re San Juan Dupont Plaza Hotel Fire Litigation</u>, 859 F.2d 1007, 1010-11 (1st Cir. 1988), the federal court traced the history of litigation abuses and increasing litigation that led to the adoption of the 1993 civil rules.

> The introduction of expansive pretrial discovery, Fed. R. Civ. P. 26-36, accelerated and enhanced this transmogrification. As lawyers became more adept at using the liberalized rules, litigation became larger and more intricate: the joinder rule stimulated growth in the size and complexity of cases by the addition of parties and claims, and the discovery rules stimulated growth in the size and complexity of cases by multiplying the opportunities for pretrial work per party and per claim. Paper manufacturers sang hosannas.
>
> The combined effect of these changes was explosive. Lawsuits became increasingly more complicated and the preparatory phases of these ever-more-complex actions took on a nightmarish quality: discovery swelling to unwieldy proportions in case after case, and often became prohibitively expensive. Trial lawyering gradually became a global, rather than a local art--and its practitioners grew evermore peripatetic. In this auxetic environment, the court's traditional oversight powers were too limp a set of reins with which to attempt to control--let alone manage--the pretrial aspects of modern litigation.

> A herd of bulls had been set loose in the decorous confines of the
> judge's lobby--and the china shop would never be the same.

859 F.2d at 1010-11 (internal citations omitted).

The CJRA and the 1993 modifications to the federal rules were intended as the means to more effectively manage cases, reduce the likelihood of abusive discovery practices, and bring cases to resolution in an economical, expeditious and efficient manner. The CJRA and the revised rules contemplated a hands-on approach, with judges becoming involved in case management and the discovery process early on. Parties would no longer have "carte blanche" unrestricted discovery. Rather, the parties needed to justify the nature and extent of discovery beyond presumptive limits. Case management deadlines would be established and enforced, and the court was required to oversee and simplify the litigation process. Thus, in the discovery area, the court was compelled to balance the parties' differing interests.

Even earlier 1983 amendments to Rule 26 recognized the need for balancing the right to broad discovery against the risk of burden or intrusion.

> Th[e] [1983] amendments formally interred any argument that
> discovery should be a free form exercise conducted in a free for all
> spirit. Discovery is not now and never was free. Discovery is
> expensive. The drafters of the 1983 amendments to sections (b) and
> (g) of Rule 26 formally recognized that fact by superimposing the
> concept of proportionality on all behavior in the discovery arena. It
> is no longer sufficient, as a precondition for conducting discovery, to
> show that the information "appears reasonably calculated to lead to
> the discovery of admissible evidence." After satisfying this threshold
> requirement counsel also must make a common sense determination,
> taking into account all the circumstances, that the information sought
> is of sufficient potential significance to justify the burden the discovery
> probe would impose, that the discovery tool selected is the most
> efficacious of the means that might be used to acquire the desired
> information (taking into account cost effectiveness and the nature of
> the information being sought), and that the timing of the probe is

> sensible, i.e., that there is no other juncture in the pretrial period when there would be a clearly happier balance between the benefit derived from and the burdens imposed by the particular discovery effort.

In re Convergent Technologies Securities Lit., 108 F.R.D. 328, 331 (D.C. Cal. 1985).

Under the revised rules of civil procedure, automatic initial disclosures were intended to reduce motion practice and to provide the parties with relevant information early in the process to ensure that both sides--plaintiff and defendant--were apprised of witnesses and documents relevant to the prosecution of claims and defenses. The discovery process was intended, under the revised rules, to become automatic. Moreover, judges were required to ensure that there were no discovery abuses, and while allowing the parties ample opportunity to obtain information necessary for the prosecution or defense of the case, the court had a corresponding duty to protect parties from oppression, undue burdens or extraordinary expenses which had become part and parcel of the pre-revision practice of law.

In viewing the present discovery dispute, the Court agrees that the relator, Harold M. Tate ("Tate"), has a right to obtain information necessary to prosecute his claim; Honeywell, Inc. ("Honeywell"), on the other hand, has a corresponding right to be free from unfair, burdensome, oppressive and expensive discovery. The CJRA and the revised rules of procedure impose an affirmative duty on the Court to be fair to both the demanding and obliging parties. It is with these principals in mind that the Court turns to the disputed discovery.

### Basis of Plaintiff's Claims

Tate's Second Amended Complaint alleges violations of the False Claims Act, 31 U.S.C. § 3729. Tate's claims arise from a contract awarded to produce 1,131 color multi-function display units (CMFD's), as well as processors to run those CMFD's for cockpits of F-16 aircraft. Tate

alleges that when Honeywell submitted its bid to manufacture the CMFD's for the fighter planes, it mis-classified a glass manufacturing subcontract with Optical Imaging Systems ("OIS") as a major subcontract. Taiwan purchased the majority of the F-16's, but some of the aircraft were purchased by European countries under a Mid-Life Update (MLU) program. The contracts in question were awarded in 1995 and DAS began producing the CMFD's and incurring costs on the glass that Honeywell purchased for their production in March 1996. It is the handling of this glass display screen, which is part of the F-16's flight computer technology, that forms the gravamen of Tate's claim.

Tate was previously an employee at Honeywell. His job was to review bids, proposals, contracts and billings prior to their submission to the government to ensure that they were in accord with appropriate cost allocation standards. He contends that when a part is supplied as part of an overall package, it is subject to a "materials handled" accounting rather than as a major sub-contract. Tate contends that Honeywell impermissibly and fraudulently mis-classified the glass display screens as a major subcontract so as to hid their true cost.

The difference between a major sub-contract and a materials handled contract is that all identifiable costs with production and installation on a major sub-contract are allocated to the contract. For example, when parts are shipped or received, the costs of shipping and receiving are allocated to that contract. The same is true for storage and overhead. General overhead costs, i.e., rent, utilities, telephone, copy machines, paper, etc., are all part of a contractor's overhead and have to be allocated to respective contracts. Tate contends that Honeywell's contract with OIS to manufacture the glass screens for the CMFD should not have been a major subcontract, but, rather, should have been treated as "materials handled."

In this case, Tate contends that by allocating the costs for the glass screens as a subcontract rather than as "materials handled," the overhead and handling costs relating to the glass display screen were not correctly allocated, and this improper accounting practice allowed Honeywell to deflate, rather than inflate, the actual costs involved. Tate's theory is that this accounting practice induced the government to award the contract to Honeywell because the improperly deflated costs made it appear that the glass display screens from a paper perspective could be produced at a lower costs. This, Tate argues, was not true. He contends that the true costs were shifted from the F-16 to other Honeywell contracts. Thus, the claims for payment made for all other contracts were "false."

## Interrogatories 3, 4 and 5

Tate seeks the criteria to determine bonuses to be paid in 1994 to Defense Avionics Systems ("DAS") senior personnel, the total bonuses paid, and the reduction if the order for the F-16 flat panel display screen contract had not been made. Tate seeks information concerning financial activity and contracts in 1993 and 1994. Yet, the contract in dispute was negotiated in the summer of 1995, and a memorandum of agreement was signed on July 21, 1995, under which Honeywell would manufacture 1,131 CMFD's.[1]

Tate's theory on why this information is necessary is to determine "Honeywell's and its employees' motives in classifying the contract negotiated and awarded in late 1993 as a major subcontract which reduced costs, protected its sole source position and ultimately led to the award of all of the F-16 contracts." Tate infers that if bonuses were paid in prior years based on reduced costs,

---

[1] While there were contracts in 1993 and 1994, they were production contracts unrelated to the development or production of CMFD's. Tate does not claim that those contracts are relevant to his present lawsuit. (*See* Response, p. 4, n. 2).

Honeywell executives would have had a financial motive to hide the true costs of the glass display screen.

Honeywell's concerns are indeed the very concerns brought to the attention of the Civil Rules Advisory Committee, which led to placing limits on the scope of discovery. Requiring a defendant to produce financial information, including compensation paid, bonuses or criteria for contracts which are not the subject of this litigation, is intrusive. While arguably the information may be relevant to compare Honeywell's prior contract handling history, the relevancy is outweighed by the burdensomeness and expense imposed on Honeywell. Moreover, disclosure of essentially private financial information, i.e., bonuses paid to particular individuals, would violate privacy interests, and the Court should not authorize this unless there exists a good and sufficient reason. Here, while the Court finds that Tate's request has arguable merit, it still must balance the request with the hardship, burden and intrusiveness imposed on Honeywell. The balance in this case tips in favor of Honeywell in being protected from annoyance, oppression and expense. Honeywell has provided Tate with the requested information for 1995 and subsequent years. This should suffice. Financial incentives to hide costs, if any exist, are apparent from documents already produced to Tate by Honeywell. The Court sees no significant reason to order production of the information for the years prior to the contract. Therefore, the Court sustains Honeywell's objection.

### Interrogatories 25 and 26

Tate asks Honeywell to disclose how much money DAS and/or Honeywell accrued or set aside as a loss contingency for this present lawsuit. Tate does not seek to establish the fact of a loss contingency as in Vanguard Savings and Loan Ass'n v. Banks, 1995 WL 555871, Civ. No. 93-CV-4627 at *3 (E.D. Pa. Sept. 18, 1995). Nor is the presence or absence of a loss contingency an

element of Tate's complaint. This request is nothing more than Tate wanting to know how Honeywell or its attorneys evaluated potential loss. The Court sees little value in requiring Honeywell to disclose its personal assessment of any potential liability.

This information is neither relevant to the claims nor is it likely to lead to the discovery of relevant, admissible evidence. The Court sustains Honeywell's objections and will not require further responses to Interrogatories 25 and 26.

### Interrogatory 29

Honeywell argues that Tate "provides almost no detail about what statements within the progress payment submissions were false, which OIS costs were treated as 'handled material costs' how much the government was asked to overpay . . . ." (Honeywell's memo in support, Doc. 79).

Tate asks Honeywell to identify the progress payment requests submitted on the F-16 contract glass costs. Tate's theory is that each submission of a progress payment constitutes a separate false claim potentially subjecting Honeywell to civil penalties.

Honeywell filed a motion to dismiss alleging pleading defects under Fed. R. Civ. P. 9(b). [2] Honeywell contends that Tate was obligated to plead fraud with specificity in connection with his allegations that the F-16 progress payments each constitute separate false claims. Honeywell asks the Court to dismiss the claims because fraud has not been pled with the specificity required by Rule 9(b). Yet, on the other hand, when Tate seeks information on the periodic claims so as to plead with specificity, Honeywell resists. The motion to dismiss, when considered in light of this motion for

---

[2] This motion is fully briefed, [Docs. 78-81], filed October 25, 2001.

discovery, raises a catch-22 issue.[3]

The Court will order production of the progress payment submissions related to the glass panel display contract.

## Interrogatory 35

Tate requests information related to major subcontract classifications by Honeywell business units other than DAS. Tate's request for information is exceedingly broad. In this interrogatory, he requests thirteen years of documents, 1988 through 2001, regarding every major subcontract at every Honeywell division. The interrogatory contains nine sub-categories of information for each subcontract. Honeywell objects to the production of these documents not only on its contention that the request is overly broad and unduly burdensome, but also based on Tate's own deposition testimony.

At his deposition, Tate testified that practices at other Honeywell divisions were irrelevant to his claims about DAS because "each business unit stands on its own according to the CAS, and it really doesn't matter how these other units handle things." (Tate depo., p. 18, lines 8-10, October 30, 2001). Tate replies that his testimony did not deal with accounting principals for supply contracts, but only with a systems integrator, which is only part of the subject matter relating to a major subcontract.

In light of Tate's own statement that practices at other Honeywell divisions are not relevant, the Court is hard-pressed to compel Honeywell to produce the massive amount of documentation requested in this interrogatory. Tate's request for documents must be balanced against the burden

---

[3] This phrase was popularized by Joseph Heller in his novel, "Catch-22." It has come to mean an absurd circular logic or a paradox in practice, law or regulation that makes one a victim of its provisions no matter what one does. Webster's New World Dictionary 224 (2nd College Ed. 1980).

and expense of production. That scale can certainly tip in favor of the requesting party. But, where as here, the requesting party acknowledges that records from other divisions may not be relevant, the scale properly tips in favor of the party opposing discovery.

## Request for Production No. 5

Tate seeks documents that discuss this litigation or administrative subpoenas issued by the Department of Defense Inspector General from January 1, 1996 through the present. Apparently, the information sought grows out of Tate's claims that Honeywell was engaging in illegal activity, and the subsequent federal investigations growing out of Tate's complaints. Honeywell asserts that the documents are not relevant and are not privileged.

The Court share's Tate's skepticism concerning Honeywell's claim of relevancy. The Court, however, is even more concerned with Honeywell's assertion of a privilege. A party may not simply assert privilege and then refuse to produce documents. It is incumbent on the party asserting the privilege to provide a <u>Vaughn</u> index.[4] In this case, Tate asserts that Honeywell has not provided an index. Accordingly, the Court will require Honeywell to either produce the requested documents or, alternatively, within the same time established for production of the documents, to serve an appropriate <u>Vaughn</u> index on Tate's counsel. Thereafter, Tate's counsel may proceed by way of a separate motion to compel production of those documents if counsel believes that they are not privileged and are subject to production.

## Request for Production No. 10

---

[4] A <u>Vaughn</u> index is a term derived from <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977, 94 S. Ct. 1564 (1974). It generally consists of a listing of withheld documents, describing the nature of the document, its author, the date of creation, and to whom the document was distributed. It also requires that withholding counsel specify the nature of the privilege claimed.

Tate seeks all fiscal year-end financial statements, profit and loss statements, and balance sheets for DAS for the period 1993 through 2000. Tate argues, "The relator needs this information to determine the damages as well as to have an overall picture of Honeywell's DAS business activities during the relevant time period." That argument, however, is insufficient to order production of all the financial information requested.

Here, Tate seeks an award of compensatory damages, mandatory treble damages, mandatory civil forfeiture penalties, attorney fees, reasonable costs and expenses. There is no dispute that evidence of a party's net worth is relevant on the issue of punitive damages. Silkwood v. Kerr-McGee Corp., 769 F.2d 1451, 1460 (10th Cir. 1985), cert. denied, 476 U.S. 1104 (1986); Ramsey v. Culpepper, 738 F.2d 1092, 1099 (10th Cir. 1984). Moreover, to completely bar a party from discovering evidence which goes to a pending claims places that party in an untenable position. In Wauchop v. Domino's Pizza, Inc., 138 F.R.D. 539, 550 (N.D. Ind. 1991), the court said:

> To require a *prima facie* showing of entitlement to punitive damages at this time, before the completion of discovery, could also be quite difficult for the plaintiff and would not be logical since the only purpose of discovery is to locate evidence to support a punitive damage claim.

Thus, Honeywell's ability to answer in punitive damages is relevant and discoverable.

That is not to say, however, that a litigant may simply allege a claim for treble or punitive damages and have wholesale access to a defendant's financial information. It is only Honeywell's present net worth that should be considered by the fact finder in determining the amount of treble or punitive damages. Woods-Drake v. Lundy, 667 F.2d 1198, 1203 n. 9 (5th Cir. 1982). A defendant's worth from years before is not relevant. In Cincinnati Insurance Co. v. Clark, 1992 WL 34128, at *2 (E.D. Pa. Feb. 19, 1992), the court was faced with a somewhat similar situation. The court stated

that the pertinent issue was a defendant's present net worth, not its worth from years before. In that case, the court required a defendant to produce financial information, but limited the request to defendant's present net worth.

So, too, here. Honeywell's present net worth is relevant in determining its ability to pay damages. Its financial history or worth years ago is not relevant. The Court will require Honeywell, if it has not already done so, to provide its current fiscal year-end financial statements, including profit and loss, and balance sheet for DAS. The Court will not require production of financial information for the other years requested by Tate.

<u>**Request for Production Nos. 11, 12, 13, 14 and 15**</u>

Tate asks for documents relating to final indirect rate submissions, final negotiated indirect rate agreements, forward pricing rate proposals, forward pricing rate agreements, and provisional billing rate proposals and agreements, and all supporting documentation made by DAS to the United States government for the years 1993 through the present.

As with Interrogatories 3, 4 and 5, Honeywell objects to producing information for the years prior to 1995, and Honeywell has produced information subsequent to 1995. For the reasons stated in the Court's analysis concerning Interrogatories 3, 4, and 5, the Court sustains Honeywell's objections. Honeywell has produced responsive documents from 1995 through the present, and the Court will not require the pre-1995 production.

<u>**Request for Production Nos. 25 and 26**</u>

Tate seeks documents sent to and received from the United States Attorney's office and/or the Defense Criminal Investigation Service Office regarding the F-16 contract progress reports in this lawsuit.

Honeywell responds that there are two categories of documents responsive to the Request: (1) documents produced to the government from Honeywell's files, apparently as part of the Grand Jury investigation; and (2) communications between Honeywell and the government concerning settlement negotiations to resolve this dispute. Honeywell indicates that it has already produced the first category of documents, and declines to produce the second category, that is, documents produced as part of settlement negotiations. Honeywell argues that it should not be compelled to produce settlement discussions and offers undertaken with the government to resolve this dispute. The Court agrees.

The public policy considerations noted by the Federal Advisory Committee Notes to Fed. R. Evid. 408 resolve this dispute. Courts wish to encourage parties to engage in settlement discussions and to resolve disputes. Desktop Direct, Inc. v. Digital Equipment Corp., 993 F.2d 755, 758 (10th Cir. 1993)(noting agreement with general proposition that encouragement of out-of-court settlements is desirable); Servants of the Paraclete, Inc. v. Great American Ins. Co., 866 F. Supp. 1560, 1575 (D.N.M. 1994)(public policy encouraging settlement embodied in Rule 408 may have tempered the liberal breadth of Rule 26(b) with respect to related discovery issues).

So as to encourage settlement discussions, courts protect the parties by ensuring that evidence related to settlement discussions will not be submitted to a fact finder for purposes of proving liability, invalidity of a claim or the amount of a claim. Fed. R. Evid. 408. The same is true for settlement negotiations. Requiring that parties disclose settlement positions made to others would thwart and impede good-faith efforts to resolve disputes. A party may be reluctant to make an offer to settle a case if evidence of that offer could be obtained by someone else. The result would be that fewer cases would be settled, more cases would go to trial, and parties would experience longer delays and

significantly more costs. Scarce judicial resources would be devoted to trying cases that could otherwise have been settled. None of this is consistent with the salutary purposes of the Civil Justice Reform Act.

The Court finds that public policy considerations that would keep settlement information private significantly outweigh Tate's curiosity concerning those negotiations. The Court sustains Honeywell's objections.

To the extent the Court ordered production of documents, <u>Vaughn</u> index or supplemental responses, they are to be provided to Tate within fifteen days.

Lorenzo F. Garcia
United States Magistrate Judge